| | | |
|---|---|---|
| James E. Mclean, Jr., #17701-058, | ) | C/A No. 9:17-2702-DCC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| United States of America, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the Court on Defendant's Motion to Dismiss Plaintiff's Complaint for medical malpractice pursuant to the Federal Tort Claims Act ("FTCA"). ECF No. 23. Plaintiff filed a response in opposition, Defendant filed a reply, and Plaintiff filed a sur-reply. ECF Nos. 26, 28, 31. In accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.), this matter was referred to United States Magistrate Bristow Marchant for pre-trial proceedings and a Report and Recommendation ("Report"). On July 13, 2018, the Magistrate Judge issued a Report recommending that Plaintiff be provided an opportunity to file a supporting affidavit from a qualified expert witness within thirty-days of this Court's adoption of the Report. ECF No. 33. If Plaintiff files such an affidavit, the Report recommends denying the Motion. *Id.* Plaintiff filed objections to the Report. ECF No. 36.

## BACKGROUND

### I. Plaintiff's Complaint

Plaintiff filed a Complaint pursuant to the FTCA, alleging that Defendant committed multiple acts of medical malpractice during Plaintiff's incarceration in the Bureau of Prisons ("BOP"). Accepting Plaintiff's allegations as true for purposes of

ruling on the Motion to Dismiss, Plaintiff contends that he has suffered from a rare bone disease known as Rickets, which is a severe Vitamin D deficiency.  ECF No. 1 at 1–2.  Prior to Plaintiff's incarceration, Plaintiff was prescribed high doses (i.e., 50,000 IU), of Vitamin D to be taken per day as well as calcium and/or phosphate supplements.  *Id.* at 2.  "Because the treatment was effective, Plaintiff was able to enjoy somewhat of a normal life, with an occasional joint pain in a knee or an elbow."  *Id.*  "Plaintiff was able to enjoy physical activities such as, but not limited to, martial arts, weight lifting, extended walks in theme parks; boating, which includes a lot of physical activity and standing; biking, and other physical activities and labors."  *Id.*

On November 22, 2002, Plaintiff was convicted of federal charges and immediately incarcerated in a county jail facility, presumably pending transfer to a BOP facility.  *Id.*  Plaintiff did not receive proper medical treatment for his Rickets in the county jail.  Thereafter, Plaintiff was transferred to a BOP facility—Federal Correctional Institution ("FCI") Gilmer—and was medically interviewed regarding his health issues.  *Id.*  During this medical interview, Plaintiff informed the medical staff that he had Rickets and that he took high doses of Vitamin D as well as calcium and phosphate for this condition.  *Id.*  Medical staff obtained consent from Plaintiff to review his prior medical records and prescribed him appropriate doses of Vitamin D, calcium, and phosphate.  *Id.*  A short time later, BOP staff reduced Plaintiff's Vitamin D and eliminated his phosphate prescription altogether.  *Id.*  In response, Plaintiff asked his "orthopedic doctor, who has treated Plaintiff's health issue rickets nearly all of his life," to comment on the reduction in Plaintiff's medication.  *Id.* at 3.  This physician wrote Plaintiff a letter in which he stated he did not think it was appropriate to reduce Plaintiff's medications.

*Id.* Plaintiff forwarded that letter to BOP medical staff; however, BOP medical staff ignored the letter and continued to provide Plaintiff with an inappropriate amount of Vitamin D and no phosphate. *Id.*

After the reduction in Plaintiff's medications, he began experiencing great pain in his knees and other joints. *Id.* He informed BOP medical staff, but no change was made in his medications. *Id.* In fact, after Plaintiff returned from being "called to court for his appeal," BOP's medical staff failed to renew Plaintiff's medicine altogether. *Id.* As a result, Plaintiff started having "great back and joint pain," which he reported to BOP's medical staff. *Id.* BOP's medical staff informed Plaintiff that he needed to purchase these medications from the commissary. *Id.* At some point, after Plaintiff went without his medication for "a while" and explained that the medications available at the commissary were insufficient, Plaintiff's medicine was renewed, albeit still at an insufficient level. *Id.*

As a result of Plaintiff's complaints about joint pain, BOP medical staff took x-rays of Plaintiff's joints and performed some lab work; however, Plaintiff's medications were not increased. *Id.* at 4. Plaintiff was then transferred to FCI-Butner, where he was again medically interviewed. *Id.* Once again, Plaintiff informed medical staff about his health issues and the medication he previously was prescribed that was effective. *Id.* Plaintiff was prescribed a calcium and Vitamin D combination supplement; however, it was insufficiently dosed to benefit Plaintiff's medical condition. *Id.* Plaintiff continued to suffer from severe pain, despite his dosage of Vitamin D being increased to 50,000 IU once per week. *Id.* at 5. After three years at FCI Butner, Plaintiff was transferred to FCI Ashland and went without any medication for "many days." *Id.* Finally, Plaintiff received

some medication, though at an insufficient dose. *Id.* Plaintiff reports that his "days and nights were pain driven." *Id.*

After spending two years at FCI Ashland, Plaintiff was transferred to his current location, FCI Estill. Once Plaintiff arrived at FCI Estill, he was not provided any medication for his Rickets for approximately one year and was told that he needed to buy vitamins at the commissary. *Id.* "Finally, after much pain and stress, Plaintiff was able to see the doctor for chronic care." *Id.* During this appointment, Plaintiff informed the doctor about his Rickets. *Id.* Although the doctor agreed to prescribe the appropriate medication, Plaintiff was again prescribed grossly insufficient quantities of Vitamin D and no phosphate even though his lab results "clearly indicate[d] the need for it." *Id.* at 6.

Plaintiff alleges that "because [he] is not getting from outside sources the proper Vitamin D and phosphate, his body [has] to get calcium and/or phosphate from other sources (reserves) within [his] body, and these other sources are his bone[s], joints, and teeth." *Id.* "Therefore, Plaintiff's bone[s], joints and teeth are being degenerated (eaten away)." *Id.* As of March 2017, Plaintiff has yet to receive the proper treatment for his Rickets at any BOP location, and Plaintiff has suffered great pain in all of his major joints. *Id.* In fact, "Plaintiff's joints have lost full range and motion to the point that he can't do any where (sic) near the things that he use[d] to do." *Id.* Plaintiff alleges that he can't wash his feet, can't wash the back of his neck, can't tie his shoes, can't stand for long periods of time, and that he is in pain all day and night. *Id.* at 6–7.

Plaintiff also alleges that he has "lost his teeth, except for two teeth that are supporting a bridge in the front of his mouth." *Id.* at 7. Plaintiff contends that he has

been seeking treatment for these dental problems for many years. *Id.* Because of this, eating and chewing became very difficult, and Plaintiff was told he was placed on a list for dentures. *Id.* "[A]fter being assured that he would get the dentures quickly, in about the month of July 2016, Plaintiff allowed the dentist to extract all of his remaining teeth that had not already been extracted or fallen out due to the lack of the [BOP] properly treating his [Rickets], which was approximately 13 teeth." *Id.* at 8. During this procedure, Plaintiff experienced substantial pain, "which caused Plaintiff so great of pain (sic) that he showered his face with tears." *Id.* at 9. Plaintiff later overheard the dentist tell another person that he "had a bad batch of Novocaine." *Id.* at 10. Plaintiff suffered other complications from the dental procedure, including numbing under his right eye that persisted for a month. *Id.* Furthermore, Plaintiff alleges that he still has not received the dentures that he was promised. *Id.* at 11–12.

The remainder of Plaintiff's Complaint largely contains detailed allegations of the severe pain that he is suffering in various body parts due to BOP's failure to properly treat his Rickets. However, Plaintiff acknowledges that he was assigned a new doctor, Dr. Lepiane, by BOP after he filed his administrative FTCA claim. *Id.* at 23. As a result of Dr. Lepiane's treatment, Plaintiff's lab tests were "very favorable." *Id.* at 23–24.

Plaintiff attached a number of exhibits to his Complaint, including three medical affidavits from fellow inmates, which are detailed below.

### A. Affidavit of Harold C. Spears III, M.D.

Harold C. Spears III worked in the medical field as a medical doctor for approximately twenty-nine years, after receiving a Bachelor's degree in Chemistry from Eckerd College and a Medical degree from Emory University School of Medicine. ECF

No. 1-2 at 1. For the first three years of his practice, he "attended a Family Practice Residency under the auspices of the University of Florida's Jacksonville Health Education Program at St. Vincent's Medical Center Family Practice Group." *Id.* Dr. Spears stated that he has been board certified in Family Practice from 1982 to present and was board certified in Emergency Medicine from 1992 until 2002. *Id.* Dr. Spears stated that is familiar with Plaintiff's medical issue, Vitamin D resistant Rickets, "which is also termed 'late-rickets or osteomalacia.'" *Id.*

Dr. Spears extensively outlined the medical records, lab reports, medication summary, and x-ray records that he reviewed in drafting his affidavit, and explained that these findings were indicative of a Vitamin D deficiency. For example, Dr. Spears "noticed that Plaintiff had a very high Alkaline Phosphatase reading, along with its associated flag. . . . Such a high Alkaline Phosphatase reading is indicative of an increase in compensatory osteoblast activity (PTH-induced increase in bone turnover); and such an indication suggests that there is a deficiency of vitamin D, or that the current treatment of vitamin D is insufficient or ineffective." *Id.* at 2 (internal quotation marks omitted). Dr. Spears observed that Plaintiff had "no current prescription for calcium or phosphate, and the current prescription for vitamin D (i.e. take one 2000 IU table twice per day) is insufficient." *Id.* Therefore, Dr. Spears opined that the radiographic findings, which indicate fractures in Plaintiff's foot and "severe joint degeneration in [Plaintiff's] elbows, knees, and ribs," "are a direct reflection of the FBOP's inadequate and ineffective medical treatment plan for Plaintiff's late rickets." *Id.* at 1–2. Therefore, Dr. Spears opined that BOP's medical care "falls below the standard of medical practices/care for such a medical condition." *Id.* at 3. Dr. Spears noted that

the appropriate standard of care would be to prescribe a large amount of Vitamin D, "in the range of 50,000 IU to 150,000 IU." *Id.* at 4. Additionally, Dr. Spears observed that he "saw no pain medicines prescribed to treat Plaintiff's pain, which would have been the standard of medical care." Dr. Spears attached several exhibits to his affidavit,[1] which appear to support at least some of his opinions, including an excerpt from the 19th Edition of Harrison's Principles of Internal Medicine, Volume 2. *Id.* at 5–6.

Dr. Spears subsequently submitted a Supplemental Affidavit, which clarified that "there are two alternative forms of vitamin D that can be used to effectively treat Plaintiff's" health issue. ECF No. 5-1 at 1. Specifically, Dr. Spears' initial Affidavit stated that Vitamin D (Ergocalciferol) treatment in the amount of 50,000 to 150,000 IU per day was the appropriate standard of care. *Id.* The Supplemental Affidavit stated that Cholecalciferol, also known as Vitamin D3, "which is easily absorbed in the body because it does not have to be further processed by the liver" would be appropriate in amounts of 8,000 to 10,000 IU per day. *Id.* While Dr. Spears noted that BOP provided Plaintiff with some Vitamin D3, the amount provided "was very insufficient" and "had no effect on Plaintiff's vitamin D level." *Id.* at 1. Additionally, the Supplemental Affidavit stated that Calcitriol, a Vitamin D metabolite, in an amount of 0.25 to 0.50 mg per day would provide proper treatment for Plaintiff's treatment. *Id.* at 1–2. Dr. Spears stated that BOP did not provide any treatment with Calcitriol. *Id.* at 2. Therefore, Dr. Spears reiterated that BOP "did not provide the standard of care to properly treat" Plaintiff's health issues. *Id.*

---

[1] The Court acknowledges that two of Dr. Spears' exhibits are Wikipedia articles, which contain extensive references in their bibliography.

**B. Affidavit of Stanley B. Marable, D.D.S.**

Stanley B. Marable practiced general dentistry for more than seventeen years, after receiving a Bachelor's in Science degree from Fort Valley State College and a Doctor of Dental Surgery from Meharry Medical College School of Dentistry. Dr. Marable obtained a license to practice dentistry in the State of Georgia in 1990. Dr. Marable opined that Plaintiff's "current health care provider (FBOP) has not provided [Plaintiff] with a consistent supply or proper amounts of vitamin D and calcium supplements for his known health condition." *Id.* at 21. As a result, Dr. Marable stated Plaintiff's teeth "were subject to breakdown of the enamel and dentin layers, pulpal exposure and abscesses, as well as decrease[d] bony support from the alveolar bone." *Id.* Dr. Marable further opined that Plaintiff's condition resulted in him "having several teeth loosened from [their] socket," with more teeth being lost as a result of abscesses. *Id.* Dr. Marable stated that these missing teeth should have been replaced, and the failure to replace these teeth caused a condition known as "super eruption," which changed Plaintiff's bite. *Id.* In sum, Dr. Marable noted that Plaintiff "has gone from a situation of barely being able to eat, as a result, [of] malocclusion (due to super eruption), to now being extremely limited to eating foods that must be very soft because he can not mechanically breakdown (chew). This limited ability to eat all types of food further limits [Plaintiff's] ability to receive other nutrients for other vital body organs." *Id.* These injuries, according to Dr. Marable, are due to "the failure of [Plaintiff's] current health care provider (FBOP) to properly treat his health condition, i.e. vitamin D resistant rickets, with proper amounts of vitamin D and calcium." *Id.*

## C. Affidavit of David M. Pon, M.P.M., M.D.

Dr. David M. Pon practiced medicine for approximately twenty-five years in Florida, after receiving a Bachelor's of Science degree in Biological Science from Stanford University; a M.P.M. degree in Public Health from the University of California, Berkeley; and a Medical Degree from the University of California, San Francisco, School of Medicine. *Id.* at 27. After graduating medical school, Dr. Pon completed an internship as a part of a residency program in Internal Medicine at Stanford University, Santa Clara Valley Medical Center. *Id.* Thereafter, Dr. Pon practiced Internal Medicine, General Practice, and Urgent Care Medicine at the Kaiser Permaanente Medicine Center, San Francisco. *Id.* Several years later, Dr. Pon completed a residency program in Opthamology at the University of Chicago, Michael Reese Medical Center, after which he was Board Certified in Opthamology. *Id.*

Dr. Pon reviewed Plaintiff's medical records, medication summary, lab reports, and x-ray reports and opined that "Plaintiff's current medical/health care provider (FBOP) did not provide sufficient treatment for the Plaintiff's health condition." *Id.* at 28. Moreover, Dr. Pon opined that "the dosages that were prescribed by the Plaintiff's current health care provider (FBOP) were far below the minimum dosages required to be effective. . . . [and] the dosages received were so small that no effect would be noted on the Plaintiff's health issue of vitamin D resistant rickets." *Id.* Therefore, according to Dr. Pon, "the treatment was insufficient for the Plaintiff's health condition," and BOP "did not sufficiently or adequately provide the Plaintiff with the proper treatment or amounts of vitamin D, calcium, and phosphate for his health condition of vitamin D resistant

rickets." *Id.* at 28–29. Accordingly, Dr. Pon concluded that "the damages and injuries sustained by the Plaintiff, as indicated in the X-ray reports, [are] a direct consequence of such inadequate treatment." *Id.* at 29.

Dr. Pon also submitted a Supplemental Affidavit, which outlines the same two alternative forms of Vitamin D discussed in Dr. Spears' supplemental affidavit. ECF No. 5-1 at 3–4.

## II. Defendant's Motion to Dismiss

Defendant filed a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on the grounds that Plaintiff "failed to state a claim of negligence, failed to exhaust any claim of medical negligence, and failed to file an affidavit of a medical expert as required under South Carolina law." ECF No. 23 at 1. The substance of Defendant's Motion only focuses on two issues: (1) whether Plaintiff properly complied with the expert affidavit requirement of South Carolina Code Section 15-36-100; and (2) whether Plaintiff should be limited to the recovery of the amount initially requested in his administrative claim.[2] *Id.* at 2–4. Plaintiff filed a Response in Opposition, in which he claimed that the increased damages sought were appropriate and legally permissible, his expert affidavits complied with Section 15-36-100, and, in the alternative, his claim should be exempt from Section 15-36-100's affidavit requirement because the negligence in this case was "common knowledge." ECF No. 26. Defendant filed a Reply addressing the "common knowledge" argument, and

---

[2] Plaintiff sought $14,000,000 in his administrative claim and later sought $15,000,000 in this litigation. ECF No. 23 at 4. As the Magistrate Judge did not address this issue in the Report, the Court need not reach the issue in this Order.

Plaintiff filed a Sur-Reply further addressing the "common knowledge" argument. ECF Nos. 28, 31.

### III. Magistrate Judge's Report

The Magistrate Judge issued a Report, which largely adopted the Defendant's arguments on the affidavit requirement of Section 15-36-100 and the "common knowledge" exception. ECF No. 33. Specifically, the Report recommends giving Plaintiff thirty days from any Order of the Court adopting the Report to secure an affidavit that complies with the affidavit requirement of Section 15-36-100. *Id.* at 13. Otherwise, the Report recommends that the Court grant Defendant's Motion to Dismiss. *Id.*

### IV. Plaintiff's Objections

Plaintiff filed detailed objections, which address the Report's recommendation. ECF No. 36. Defendant did not file a Reply.

<u>**LEGAL STANDARD**</u>

### I. Review of a Magistrate's Report

The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with the Court. *See Mathews v. Weber*, 423 261 (1976). The Court is charged with making a de novo determination of any portion of the Report of the Magistrate Judge to which a specific objection is made. The Court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or recommit the matter to the Magistrate Judge with instructions. *See* U.S.C. § 636(b).

The Court will review the Report only for clear error in the absence of an objection. *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005) (stating that "in the absence of timely filed objection, a district court need not conduct a *de novo* review, but instead must only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." (citation omitted)).

## II. Motion to Dismiss

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits the dismissal of an action if the complaint fails to "state a claim upon which relief can be granted." Such a motion tests the legal sufficiency of the complaint and "does not resolve contests surrounding the facts, the merits of the claim, or the applicability of defenses . . . . Our inquiry then is limited to whether the allegations constitute 'a short and plain statement of the claim showing that the pleader is entitled to relief." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (internal quotation marks and citation omitted). In a Rule 12(b)(6) motion, the court is obligated to "assume the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

To survive a motion to dismiss, the complaint must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although the requirement of plausibility does not impose a probability requirement at this stage, the complaint must show more than a "sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A

complaint has "facial plausibility" where the pleading "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*


## DISCUSSION

### I.  South Carolina Code Section 15-36-100

In the Tort Reform Act of 2005 Relating to Medical Malpractice, the South Carolina General Assembly enacted several statutes that placed procedural and substantive limitations on plaintiffs in medical malpractice actions.  Among these changes, the General Assembly enacted South Carolina Code Section 15-36-100, which requires plaintiffs in medical malpractice cases[3] to "file as part of the complaint an affidavit of an expert witness which must specify at least one negligent act or omission claimed to exist and the factual basis for each claim based on the available evidence at the time of the filing of the affidavit."  S.C. Code Ann. § 15-36-100(B).  This statute defines "expert witness" as "an expert who is qualified as to the acceptable conduct of the professional whose conduct is at issue and who:"

> 1.  is licensed by an appropriate regulatory agency to practice his or her profession in the location in which the expert practices or teaches; and
>
> 2.  (a) is board certified by a national or international association or academy which administers written and oral examinations for certification in the area of practice or specialty about which the opinion on the standard of care is offered; or

---

[3] Pre-suit affidavits are also required in a number of other professional malpractice actions.  *See* S.C. Code Ann. § 15-36-100(G) (listing the professions to which the affidavit requirement applies).

(b) has actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given as the result of having been regularly engaged in:

    i.    the active practice of the area of specialty of his or her profession for at least three of the last five years immediately preceding the opinion;

    ii.    the teaching of the area of practice or specialty of his or her profession for at least half of his or her professional time as an employed member of the faculty of an educational institution which is accredited in the teaching of his or her profession for at least three of the last five years immediately preceding the opinion; or

    iii.    any combination of the active practice or the teaching of his or her profession in a manner in which meets the requirements of subitems (i) and (ii) for at least three of the last five years immediately preceding the opinion;

3. is an individual not covered by subsections (A)(1) or (2), that has scientific, technical, or other specialized knowledge which may assist the trier of fact in understanding the evidence and determining a fact or issue in the case, by reason of the individual's study, experience, or both. However, an affidavit filed pursuant to subsection (B) by an expert qualified under this subsection must contain an explanation of the expert's credentials and why the expert is qualified to conduct the review required by subsection (B). The defendant is entitled to challenge the sufficiency of the expert's credentials pursuant to subsection (E).

S.C. Code Ann. § 15-36-100(A).[4]

---

[4] The South Carolina General Assembly also enacted South Carolina Code Section 15-79-125 in 2005, which requires the filing of a pre-suit Notice of Intent to File Suit in South Carolina Circuit Court, mediating the case, and exchanging discovery prior to initiating a medical malpractice lawsuit. Although Defendant has raised that statute defensively in other FTCA cases, it did not do so here. *See Grant v. United States*, No. 3:17-cv-0377-CMC, 2017 WL 2265956, at *10 (D.S.C. May 24, 2017) (declining to dismiss the plaintiff's lawsuit for failing to comply with Section 15-79-125 because those procedures "at least partially duplicate the administrative claim requirement of the FTCA" and ordering additional briefing on the applicability of Section 15-79-125 in FTCA actions).

The Report first acknowledged, "Plaintiff does not dispute that none of his three expert witnesses is licensed to practice medicine." ECF No. 33 at 9. Therefore, the relevant inquiry is whether Plaintiff's expert affidavits fit within the ambit of Section 15-36-100(A)(3), which permits affidavits from individuals that have "scientific, technical, or other specialized knowledge which may assist the trier of fact in understanding the evidence and determining a fact or issue in the case, by reason of the individual's study, experience, or both." The Report concluded that they did not, primarily relying on the Supreme Court of South Carolina's recent decision in *Eades v. Palmetto Cardiovascular & Thoracic, PA*, 810 S.E.2d 848 (S.C. 2018).

In *Eades*, the Supreme Court addressed a case where a plaintiff used an affidavit from vascular and critical care surgeon in a case against emergency medicine and primary care physicians. *Id.* at 851. The Supreme Court found that Section 15-36-100(A)(3) "contemplates the production of an expert affidavit from a doctor who is not certified in or does not practice in the same area of medicine as the defendant doctor, but otherwise possesses specialized knowledge to assist the trier of fact." *Id.* at 851–52. In light of that finding, the Supreme Court found "the information contained in [the surgeon's] affidavit clearly sufficient to satisfy [the statutory] provision." *Id.* at 852. Specifically, the Supreme Court referenced the surgeon's explanation that "he is aware of the degree of care and skill ordinarily exercised by members of the medical profession under the same or similar circumstances as it relates to the care and treatment of patients such as [Plaintiff]. . . . This knowledge is based upon [his] education, training, and experience." *Id.* Additionally, the surgeon explained that his practice of medicine involved evaluating and treating issues similar to those faced by

the plaintiff. *Id.* (internal quotation marks omitted). Importantly, the Supreme Court characterized Section 15-36-100(A)(3) as imposing "general requirements" compared to the more stringent requirements of Section 15-36-100(A)'s other subsections. *Id.*

The Report emphasized the Supreme Court's reference to the plaintiff's expert as a licensed, practicing doctor. Indeed, the plaintiff's expert in *Eades* was licensed and actively practicing in areas directly relevant to the subject matter of the underlying lawsuit. Yet, the language of Section 15-36-100(A)(3) does not impose any active practice or licensing requirement and is, in fact, far more general. To extrapolate from *Eades* that an expert qualified under Section 15-36-100(A)(3) must be in active practice or licensed "would be to succumb to the logical fallacy of *cum hoc ergo proper hoc* (i.e., using correlation to establish causation)." *Conway v. A.I. Dupont Hosp. for Children*, No. 04-4862, 2009 WL 57016, at *10 (E.D. Penn. Jan. 6, 2009) (citations omitted); *cf. State Farm Fire & Cas. Ins. Co. v. Sproull*, Nos. 7:16-cv-03998-AMQ, 7:17-cv-00234-AMQ, 2018 WL 3439629, at *6–7 (D.S.C. July 17, 2018) (finding that the doctrine of negligent entrustment is not limited to cases involving alcohol simply because Supreme Court of South Carolina cases addressing the cause of action involved alcohol).

In fact, some states do require an expert affidavit from a licensed physician. *See, e.g.,* N.J.S.A. 2A:53A-41 ("In an action alleging medical malpractice, a person shall not give expert testimony or execute an affidavit pursuant to the provisions of [the affidavit of merit statute] on the appropriate standard of practice or care unless the person is licensed as a physician or other health care professional in the United States . . . ."). Yet, the South Carolina General Assembly did not include such a requirement in Section 15-36-100(A)(3). Therefore, the Court finds that the appropriate analysis is

simply whether the proposed expert "has scientific, technical, or other specialized knowledge which may assist the trier of fact in understanding the evidence and determining a fact or issue in the case, by reason of the individual's study, experience, or both." S.C. Code Ann. § 15-36-100(A)(3).

Under the facts of this case, the Court concludes that Dr. Spears' affidavit is sufficient to qualify under Section 15-36-100(A)(3). Dr. Spears has a Bachelor's degree in Chemistry, a Medical degree from Emory University, and practiced family medicine for twenty-nine years. ECF No. 1-2 at 1. He has been board certified in Family Medicine and Emergency Medicine for a significant portion of his career, and stated that he is familiar with Plaintiff's health condition—Vitamin D resistant Rickets. *Id.* Moreover, he stated that "[i]t is well known that a condition such as late rickets (osteomalacia) should be treated with high dose amounts of vitamin D, and vitamin D metabolites, together with calcium" because "[t]he two work together in the body" in order to mitigate "impaired mineral ion homeostasis." *Id.* at 2. In sum, Dr. Spears' Affidavit and Supplemental Affidavit thoroughly outline his familiarity with Rickets and his knowledge of the applicable standard of care for treating Rickets in a clinical setting.

Conversely, the affidavits of Dr. Marable and Dr. Pon do not satisfy the standard set forth in Section 15-36-100(A)(3). While both individuals appear to be well qualified in their respective fields—dentistry and ophthalmology—their clinical experience is too attenuated to satisfy the knowledge and experience standards of Section 15-35-100(A)(3).[5] By comparison, Dr. Spears' experience in Family Medicine was geared

---

[5] Plaintiff's Complaint focuses on Defendant's failure to treat his Rickets by adequately prescribing Vitamin D, phosphate, and calcium. Therefore, the Court does not construe the Complaint as alleging dental malpractice related to the numerous dental maladies

towards primary care treatment of patients and their various injuries. "Family medicine, as described by the American Board of Medical Specialties, is extremely broad: Family physicians deliver a range of acute, chronic and preventive medical care services. In addition to diagnosing and treating illness, they also provide preventive care, including routine checkups, health-risk assessments, immunization and screening tests, and personalized counseling on maintaining a healthy lifestyle. Family physicians also manage chronic illness, often coordinating care provided by other subspecialists." *Oliver v. Main*, No. 12-03757-SDW-SCM, 2016 WL 1305292, at *5 (D.N.J. April 4, 2016) (internal quotation omitted). We caution, however, that this Order is not to be read as finding that Family Medicine doctors are qualified to offer expert opinions on all medical issues. To the contrary, many, if not most, medical malpractice cases will necessitate an expert opinion from a specialist.

Plaintiff contends in his objections that Federal Rules of Evidence 702 and 703 should control the analysis of whether an expert is qualified under Section 15-36-100(A)(3). The Court emphasizes that it does not adopt this interpretation, as the Court recognizes that Section 15-36-100(A)(3) is the substantive law of the State of South Carolina. Nonetheless, as detailed above, Dr. Spears' Affidavit is sufficient under the substantive law of Section 15-36-100(A)(3); therefore, Plaintiff's Complaint is appropriately pled. Accordingly, the Court accepts Plaintiff's objections in part and finds that Dr. Spears' Affidavit is sufficient to satisfy the plain language of Section 15-36-

---

set forth throughout the Complaint. Instead, the Court understands the dental injuries to be included to demonstrate the *harm* that befell Plaintiff from Defendant's failure to adequately prescribe his medication.

100(A)(3); however, the Report recommended rejecting Plaintiff's affidavits for another reason, which is addressed below.

## II.    Unauthorized Practice of Medicine

The Report recommended rejecting Plaintiff's expert affidavits because the affiants "are prison inmates who have had their medical licenses revoked and who under state law are not qualified to express an expert medical opinion." ECF No. 33 at 11 (citing South Carolina's unauthorized practice of medicine statute). In his objections, Plaintiff disputes the Report's recommendation in this regard, and provides the Court with authority that experts who are unlicensed in South Carolina are frequently permitted to offer expert testimony. The Court agrees with Plaintiff.

The Supreme Court of South Carolina has taken a dim view of statutes that restrict out of state, unlicensed experts from offering expert testimony in South Carolina Courts. On August 24, 2006, the Supreme Court of South Carolina issued an Order addressing Act No. 385 of 2006, which defined the "practice of medicine" to mean "testifying as a physician in an administrative, civil, or criminal proceeding in this State by expressing an expert medical opinion." *Re: Act No. 385 of 2006–relating to defining the "practice of medicine"*, S.C. Sup. Ct. Order dated August 24, 2006 (quoting S.C. Code Ann. § 40-47-20(36)(h)). The Supreme Court suspended the relevant statute as it related to expert testimony, noting:

> After careful consideration, we believe that while the General Assembly certainly sought, through Act 385, to make needed revisions to the methods South Carolina courts utilize in the area of expert medical testimony, the effect of the revised statutes has the potential to substantially impair the orderly administration of justice. Specifically, Act 385 casts serious doubt on a physician's ability to offer testimony regarding the treatment provided to a witness, party litigant, or criminal defendant if the physician, at the time of trial, resides outside of South

Carolina. This categorical exclusion overlooks the fact that the physician may have treated the patient in the physician's home jurisdiction, and also that the physician, although at one time licensed and providing treatment to the patient in South Carolina, has relocated out of this state. We believe requiring a treating physician to seek a South Carolina medical license before offering often necessary testimony strains Act 385 far beyond its intended scope.

Additionally, Act 385 is ambiguous as to its relevance to pre-trial practices and proceedings that are of fundamental importance to the judicial process. For example, Act 385's applicability to witnesses used during discovery that might not be used at trial is unclear. Furthermore, although expert testimony is traditionally presented by a witness offering live testimony, lawyers often draw heavily from learned treatises authored by prominent national experts. It would do a great disservice to our system of justice if the doors of South Carolina courtrooms were closed to these scholarly works and the country's leading medical scholars, who may have no intentions of ever visiting this jurisdiction, because our state law would deem them unqualified to offer expert testimony by virtue of their refusal to subject themselves to the disciplinary authority of the South Carolina Board of Medical Examiners.

The South Carolina Constitution vests this Court with the authority to make rules governing the administration of the unified South Carolina court system. S.C. Const. art V, § 4. In order to prevent a significant impairment to this Court's duty to properly administer the judicial power of South Carolina, and pursuant to Article V, Section 4's authority, we hereby temporarily delay judicial enforcement of Act 385 insofar as the Act requires a physician to obtain a license to practice medicine in South Carolina before offering expert medical testimony in a South Carolina administrative or court proceeding.

While we remain respectful of the General Assembly's voice in matters of practice and procedure in South Carolina's courts, this Court cannot allow the administration of justice to be substantially impaired . . . .

*Id.*

The Report dismisses Plaintiff's reliance on this Order, by stating that none of Plaintiff's experts are actively practicing physicians who have treated Plaintiff, "prominent national experts," or "leading medical scholars." ECF No. 33 at 10–11. While the Court, of course, agrees with the Report's factual assessment, the Court

views the implications of this Order much more broadly, particularly when it is read in concert with subsequent holdings of the Supreme Court of South Carolina.

In *Baggerly v. CSX Transp., Inc.*, 635 S.E.2d 97 (S.C. 2006), issued four days after the previously discussed Order, the Supreme Court of South Carolina addressed a similar issue in the context of an engineer licensing statute. The plaintiff in *Baggerly*—a locomotive engineer—was injured when a street sweeper collided with an Amtrak passenger train. *Id.* at 99. Prior to opening arguments, the defendants moved to exclude the testimony of one of plaintiff's expert witnesses—a professional engineer from California—who was retained as an accident reconstruction expert. *Id.* at 102. The trial court granted the defendants' motion, finding that the engineer could not testify because he was not a South Carolina licensed professional engineer. *Id.* (noting the trial court's reliance on South Carolina Code Section 40-22-30[6]). On appeal, the plaintiff argued that the purpose of the licensing statute "is not to restrict the admission of expert testimony in state court litigation, but rather to protect South Carolina consumers from unqualified people holding themselves out as engineers." *Id.* at 103.

The Supreme Court of South Carolina agreed with the plaintiff for three reasons. First, the Supreme Court held that one of the primary purposes of the licensing statute "is to shield South Carolina consumers from those who are not properly credentialed pursuant to this State's standards, but who nevertheless hold themselves out to be professional engineers." *Id.* The Supreme Court noted that the engineer's "services were being offered to a South Carolina jury, not to the State's citizens seeking

---

[6] "[I]t is unlawful for a: (1) person in a public or private capacity to practice or offer to practice engineering or surveying without being licensed pursuant to this chapter . . ." S.C. Code Ann. § 40-22-30; *see also* S.C. Code Ann. § 40-22-20(25) (defining the "practice of engineering" to include providing "expert technical testimony").

traditional professional engineering services." *Id.* Second, the Supreme Court found that the defendants' proposed interpretation of the licensing statute "would clearly contravene Rule 702, SCRE, which states that if 'scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify.'" *Id.* at 103–04 (quoting Rule 702, SCRE). To reject the engineer's testimony, the Supreme Court stated, would be to "effect a significant limitation on Rule 702." *Id.* at 104. Finally, and perhaps most importantly, the Supreme Court held that the result of the defendants' interpretation of the licensing statute "would be to limit the truth-seeking duty of the courts of this State." *Id.* The Supreme Court further noted:

> We can envision numerous litigation scenarios where a party's position might only be supported by the expert testimony of an engineer licensed and practicing outside the state of South Carolina. Yet, experts are intended **to assist juries**. We refuse to endorse an interpretation of the professional engineer licensing statute which has the potential of either preventing out-of-state experts from testifying in South Carolina courts or imposing the unreasonable burden of getting licensed in this State simply to be permitted to provide forensic testimony.

*Id.* (emphasis in original).

More than five years later, in *State v. Jerry Buck Inman*, 720 S.E.2d 31 (S.C. 2011), the Supreme Court again confronted a situation where an expert licensing statute was used offensively by a party in litigation. In *Inman*, a capital defendant sought to introduce the testimony of a Georgia-licensed clinical social worker "as an expert in the field of trauma, abuse, forensic and therapeutic interviewing, and as a social historian in capital sentencing cases." *Id.* at 36 (internal quotation marks omitted). The Solicitor argued that the expert was not permitted to testify as an expert

under the relevant licensing statute and "pointed out that the statute carries both civil and criminal penalties for violation." *Id.* "The judge overruled the Solicitor's objection as he believed the intent of the statute was to prevent persons from opening offices to conduct treatment in this state . . . ." *Id.* Despite a later offer of immunity from the Solicitor, the trial judge made an affirmative finding of prosecutorial misconduct, which was affirmed by the Supreme Court on appeal. *Id.* at 39; *see also id.* at 44 ("We find the Solicitor's conduct toward [the expert] unequivocally constituted witness intimidation.").

In reviewing the Supreme Court's 2006 Order and the cases that followed, the Court concludes that the Supreme Court of South Carolina has unequivocally held that professional licensing statutes should not be used offensively in litigation to prevent experts from testifying and preclude the truth-seeking functions of courts. Instead, the relevant inquiry should focus on whether the expert is qualified under the relevant evidentiary or statutory rule governing the offering of expert testimony.[7] As the Plaintiff artfully noted in his objections, "[t]he South Carolina Supreme Court understood that it is the knowledge, skill, experience, training, learning, or education that qualifies the expert witness, not the license[.] [T]he license only gives the right and privileges to practice." ECF No. 36 at 6.

_____

[7] The Court is mindful of the fact that the experts in both *Baggerly* and *Inman* were licensed by their respective states; however, the cases make clear that the licensure is only one factor to consider in evaluating the expert's qualifications under the relevant evidentiary rule or statute. *See, e.g., Fields v. J. Haynes Waters Builders, Inc.*, 658 S.E.2d 80, 86 (S.C. 2008) ("Although lack of licensing and violations of statutory law may often coincide with a lack of specialized skill or knowledge, these attributes are not always bedfellows."). Moreover, the Court can easily envision a scenario where an expert is renowned in an area of medicine but has failed to maintain an active license due to a focus on research or is simply retired. Certainly, such an expert would be qualified under Section 15-36-100(A)(3).

## III.  Common Knowledge Exception

The Report also found that Plaintiff's claims did not fit within the "common knowledge"[8] exception to Section 15-36-100's affidavit requirement.  In light of the Court's finding that Dr. Spears' Affidavit satisfies the threshold-filing requirement under Section 15-36-100, the Court need not address Plaintiff's objections on this finding.  The Court notes, however, that the Magistrate Judge's discussion of this issue is well reasoned and appropriate based on the Court's research of the issue.[9]

## IV.  Public Policy

The Report expresses a number of valid public policy concerns about the participation of incarcerated medical professionals serving as expert witnesses in litigation.  ECF No. 33 at 11.  Initially, the Court notes that the pleadings, briefing, and affidavits in this case are thorough, well reasoned, and comply with both federal and state statutory and procedural law.  While Defendant has a well-founded concern about inmates serving as expert witnesses in pro se litigation brought by other inmates, the

---

[8] *See* S.C. Code Ann. § 15-36-100(C)(2) ("The contemporaneous filing requirement of subsection (B) is not required to support a pleaded specification of negligence involving subject matter that lies within the ambit of common knowledge and experience, so that no special learning is needed to evaluate the conduct of the defendant.").

[9] The Court notes that there is some authority from other jurisdictions to support Plaintiff's "common knowledge" exception argument.  *See, e.g., Jackson v. Fauver*, 334 F. Supp. 2d 697 (D.N.J. 2004) (applying New Jersey law and finding that an "affidavit of merit" was unnecessary in cases involving, *inter alia*, the failure to provide various plaintiffs with diabetes medication, HIV/AIDS medication, blood pressure medication, support stockings, and a knee brace because "[a] reasonable jury would not need the assistance of an expert to conclude that CMS personnel were negligent when they allegedly failed both to provide these plaintiffs with medical care prescribed for them by their treating specialists and to follow the medical instructions of these specialists. Common sense—the judgment imparted by human experience—would tell a layperson that medical personnel charged with caring for an inmate with a serious medical need should provide this inmate his prescribed treatment in a timely fashion." (internal quotation omitted)).

Court must balance those practical concerns with Plaintiff's right to have his grievances heard before an independent fact-finder through the court process. This case will no doubt implicate various security and logistical concerns that must be dealt with as they arise, but the Court is confident that the BOP and judiciary can make appropriate accommodations if necessary. That said, the Court emphasizes that the holding in this case is limited to the unique factual circumstances presented. The Court will not tolerate frivolous proceedings brought by inmates in future cases, and there are a number of procedural and remedial safeguards inherent to the judicial process to deal with such cases if necessary. The Court will not, however, deprive Plaintiff of his day in Court due to hypothetical concerns that may arise in future cases. *Cf. Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 593 n.13 (Stevens, J., dissenting) ("The potential for sprawling, costly, and hugely time-consuming discovery is no reason to throw the baby out with the bathwater . . . [in light of] a district court's case-management arsenal.").

## CONCLUSION

At the Motion to Dismiss stage of this litigation, the Court holds that Dr. Spears' Affidavit complies with the substantive requirement of Section 15-36-100(A)(3). Of course, Plaintiff must still prove the allegations of his case, which will impose uniquely difficult considerations. Dr. Spears will, of course, potentially be exposed to withering cross-examination in light of his current incarceration and the loss of his medical license. Additionally, the Court's holding is limited to finding that Dr. Spears' Affidavit complies with Section 15-36-100. The Court has not yet qualified Dr. Spears to offer testimony in this case under the appropriate federal evidentiary rules, and Defendant may challenge Dr. Spears' qualifications and specialized knowledge at the appropriate

time.  As the Magistrate Judge recommended in the Report, it may be wise for Plaintiff to obtain an expert opinion from his past or current treating physicians.

Accordingly, the Court respectfully **DECLINES** to adopt the Report, and Defendant's Motion to Dismiss [23] is **DENIED.**  This matter is recommitted to the Magistrate Judge for further pre-trial proceedings.

IT IS SO ORDERED.

s/ Donald C. Coggins, Jr.
United States District Judge

August 22, 2018
Spartanburg, South Carolina