UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| James E. Mclean, Jr., #17701-058, | ) | C/A No. 9:17-2702-DCC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| United States of America, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the Court on Defendant's Motion to Reconsider. ECF No. 41. Plaintiff filed a Response in Opposition. ECF No. 43. Accordingly, the matter is ripe for review.

## **BACKGROUND**

### I. Plaintiff's Complaint

Plaintiff filed a Complaint pursuant to the Federal Tort Claims Act, alleging that Defendant committed multiple acts of medical malpractice during Plaintiff's incarceration in the Bureau of Prisons ("BOP"). Accepting Plaintiff's allegations as true for purposes of ruling on the Motion to Dismiss, Plaintiff contends that he has suffered from a rare bone disease known as Rickets, which is a severe Vitamin D deficiency. ECF No. 1 at 1–2. Prior to Plaintiff's incarceration, Plaintiff was prescribed high doses (i.e., 50,000 IU), of Vitamin D to be taken per day as well as calcium and/or phosphate supplements. *Id.* at 2. "Because the treatment was effective, Plaintiff was able to enjoy somewhat of a normal life, with an occasional joint pain in a knee or an elbow." *Id*. "Plaintiff was able to enjoy physical activities such as, but not limited to, martial arts, weight lifting, extended walks

1

in theme parks; boating, which includes a lot of physical activity and standing; biking, and other physical activities and labors." *Id.*

On November 22, 2002, Plaintiff was convicted of federal charges and immediately incarcerated in a county jail facility, presumably pending transfer to a BOP facility. *Id.* Plaintiff did not receive proper medical treatment for his Rickets in the county jail. Thereafter, Plaintiff was transferred to a BOP facility—Federal Correctional Institution ("FCI") Gilmer—and was medically interviewed regarding his health issues. *Id.* During this medical interview, Plaintiff informed the medical staff that he had Rickets and that he took high doses of Vitamin D as well as calcium and phosphate for this condition. *Id.* Medical staff obtained consent from Plaintiff to review his prior medical records and prescribed him appropriate doses of Vitamin D, calcium, and phosphate. *Id.* A short time later, BOP staff reduced Plaintiff's Vitamin D and eliminated his phosphate prescription altogether. *Id.* In response, Plaintiff asked his "orthopedic doctor, who has treated Plaintiff's health issue rickets nearly all of his life," to comment on the reduction in Plaintiff's medication. *Id.* at 3. This physician wrote Plaintiff a letter in which he stated he did not think it was appropriate to reduce Plaintiff's medications. *Id.* Plaintiff forwarded that letter to BOP medical staff; however, BOP medical staff ignored the letter and continued to provide Plaintiff with an inappropriate amount of Vitamin D and no phosphate. *Id.*

After the reduction in Plaintiff's medications, he began experiencing great pain in his knees and other joints. *Id.* He informed BOP medical staff, but no change was made in his medications. *Id.* In fact, after Plaintiff returned from being "called to court for his appeal," BOP's medical staff failed to renew Plaintiff's medicine altogether. *Id.* As a

2

result, Plaintiff started having "great back and joint pain," which he reported to BOP's medical staff. *Id*. BOP's medical staff informed Plaintiff that he needed to purchase these medications from the commissary. *Id*. At some point, after Plaintiff went without his medication for "a while" and explained that the medications available at the commissary were insufficient, Plaintiff's medicine was renewed, albeit still at an insufficient level. *Id*.

As a result of Plaintiff's complaints about joint pain, BOP medical staff took x-rays of Plaintiff's joints and performed some lab work; however, Plaintiff's medications were not increased. *Id*. at 4. Plaintiff was then transferred to FCI-Butner, where he was again medically interviewed. *Id*. Once again, Plaintiff informed medical staff about his health issues and the medication he previously was prescribed that was effective. *Id*. Plaintiff was prescribed a calcium and Vitamin D combination supplement; however, it was insufficiently dosed to benefit Plaintiff's medical condition. *Id*. Plaintiff continued to suffer from severe pain, despite his dosage of Vitamin D being increased to 50,000 IU once per week. *Id*. at 5. After three years at FCI Butner, Plaintiff was transferred to FCI Ashland and went without any medication for "many days." *Id*. Finally, Plaintiff received some medication, though at an insufficient dose. *Id*. Plaintiff reports that his "days and nights were pain driven." *Id.*

After spending two years at FCI Ashland, Plaintiff was transferred to his current location, FCI Estill. Once Plaintiff arrived at FCI Estill, he was not provided any medication for his Rickets for approximately one year and was told that he needed to buy vitamins at the commissary. *Id*. "Finally, after much pain and stress, Plaintiff was able to see the doctor for chronic care." *Id*. During this appointment, Plaintiff informed the doctor about his Rickets. *Id*. Although the doctor agreed to prescribe the appropriate medication,

3

Plaintiff was again prescribed grossly insufficient quantities of Vitamin D and no phosphate even though his lab results "clearly indicate[d] the need for it." *Id*. at 6.

Plaintiff alleges that "because [he] is not getting from outside sources the proper Vitamin D and phosphate, his body [has] to get calcium and/or phosphate from other sources (reserves) within [his] body, and these other sources are his bone[s], joints, and teeth." *Id*. "Therefore, Plaintiff's bone[s], joints and teeth are being degenerated (eaten away)." *Id*. As of March 2017, Plaintiff has yet to receive the proper treatment for his Rickets at any BOP location, and Plaintiff has suffered great pain in all of his major joints. *Id*. In fact, "Plaintiff's joints have lost full range and motion to the point that he can't do any where (sic) near the things that he use[d] to do." *Id*. Plaintiff alleges that he can't wash his feet, can't wash the back of his neck, can't tie his shoes, can't stand for long periods of time, and that he is in pain all day and night. *Id*. at 6–7.

Plaintiff also alleges that he has "lost his teeth, except for two teeth that are supporting a bridge in the front of his mouth." *Id*. at 7. Plaintiff contends that he has been seeking treatment for these dental problems for many years. *Id*. Because of this, eating and chewing became very difficult, and Plaintiff was told he was placed on a list for dentures. *Id*. "[A]fter being assured that he would get the dentures quickly, in about the month of July 2016, Plaintiff allowed the dentist to extract all of his remaining teeth that had not already been extracted or fallen out due to the lack of the [BOP] properly treating his [Rickets], which was approximately 13 teeth." *Id*. at 8. During this procedure, Plaintiff experienced substantial pain, "which caused Plaintiff so great of pain (sic) that he showered his face with tears." *Id*. at 9. Plaintiff later overheard the dentist tell another person that he "had a bad batch of Novocaine." *Id.* at 10. Plaintiff suffered other

4

complications from the dental procedure, including numbing under his right eye that persisted for a month. *Id*. Furthermore, Plaintiff alleges that he still has not received the dentures that he was promised. *Id*. at 11–12.

The remainder of Plaintiff's Complaint largely contains detailed allegations of the severe pain that he is suffering in various body parts due to BOP's failure to properly treat his Rickets. However, Plaintiff acknowledges that he was assigned a new doctor, Dr. Lepiane, by BOP after he filed his administrative FTCA claim. *Id.* at 23. As a result of Dr. Lepiane's treatment, Plaintiff's lab tests were "very favorable." *Id*. at 23–24.

Plaintiff attached a number of exhibits to his Complaint, including three medical affidavits from fellow inmates, which are detailed below.

### A. Affidavit of Harold C. Spears III, M.D.

Harold C. Spears III worked in the medical field as a medical doctor for approximately twenty-nine years, after receiving a Bachelor's degree in Chemistry from Eckerd College and a Medical degree from Emory University School of Medicine. ECF No. 1-2 at 1. For the first three years of his practice, he "attended a Family Practice Residency under the auspices of the University of Florida's Jacksonville Health Education Program at St. Vincent's Medical Center Family Practice Group." *Id*. Dr. Spears stated that he has been board certified in Family Practice from 1982 to present and was board certified in Emergency Medicine from 1992 until 2002. *Id*. Dr. Spears stated that is familiar with Plaintiff's medical issue, Vitamin D resistant Rickets, "which is also termed 'late-rickets or osteomalacia.'" *Id.*

Dr. Spears extensively outlined the medical records, lab reports, medication summary, and x-ray records that he reviewed in drafting his affidavit, and explained that

5

these findings were indicative of a Vitamin D deficiency. For example, Dr. Spears "noticed that Plaintiff had a very high Alkaline Phosphatase reading, along with its associated flag. . . . Such a high Alkaline Phosphatase reading is indicative of an increase in compensatory osteoblast activity (PTH-induced increase in bone turnover); and such an indication suggests that there is a deficiency of vitamin D, or that the current treatment of vitamin D is insufficient or ineffective." *Id*. at 2 (internal quotation marks omitted). Dr. Spears observed that Plaintiff had "no current prescription for calcium or phosphate, and the current prescription for vitamin D (i.e. take one 2000 IU table twice per day) is insufficient." *Id*. Therefore, Dr. Spears opined that the radiographic findings, which indicate fractures in Plaintiff's foot and "severe joint degeneration in [Plaintiff's] elbows, knees, and ribs," "are a direct reflection of the FBOP's inadequate and ineffective medical treatment plan for Plaintiff's late rickets." *Id*. at 1–2. Therefore, Dr. Spears opined that BOP's medical care "falls below the standard of medical practices/care for such a medical condition." *Id*. at 3. Dr. Spears noted that the appropriate standard of care would be to prescribe a large amount of Vitamin D, "in the range of 50,000 IU to 150,000 IU." *Id*. at 4. Additionally, Dr. Spears observed that he "saw no pain medicines prescribed to treat Plaintiff's pain, which would have been the standard of medical care." Dr. Spears attached several exhibits to his affidavit,[1] which appear to support at least some of his opinions, including an excerpt from the 19th Edition of Harrison's Principles of Internal Medicine, Volume 2. *Id*. at 5–6.

---

[1] The Court acknowledges that two of Dr. Spears' exhibits are Wikipedia articles, which contain extensive references in their bibliography.

Dr. Spears subsequently submitted a Supplemental Affidavit, which clarified that "there are two alternative forms of vitamin D that can be used to effectively treat Plaintiff's" health issue. ECF No. 5-1 at 1. Specifically, Dr. Spears' initial Affidavit stated that Vitamin D (Ergocalciferol) treatment in the amount of 50,000 to 150,000 IU per day was the appropriate standard of care. *Id.* The Supplemental Affidavit stated that Cholecalciferol, also known as Vitamin D3, "which is easily absorbed in the body because it does not have to be further processed by the liver" would be appropriate in amounts of 8,000 to 10,000 IU per day. *Id.* While Dr. Spears noted that BOP provided Plaintiff with some Vitamin D3, the amount provided "was very insufficient" and "had no effect on Plaintiff's vitamin D level." *Id*. at 1. Additionally, the Supplemental Affidavit stated that Calcitriol, a Vitamin D metabolite, in an amount of 0.25 to 0.50 mg per day would provide proper treatment for Plaintiff's treatment. *Id*. at 1–2. Dr. Spears stated that BOP did not provide any treatment with Calcitriol. *Id*. at 2. Therefore, Dr. Spears reiterated that BOP "did not provide the standard of care to properly treat" Plaintiff's health issues. *Id*.

### B. Affidavit of Stanley B. Marable, D.D.S.

Stanley B. Marable practiced general dentistry for more than seventeen years, after receiving a Bachelor's in Science degree from Fort Valley State College and a Doctor of Dental Surgery from Meharry Medical College School of Dentistry. Dr. Marable obtained a license to practice dentistry in the State of Georgia in 1990. Dr. Marable opined that Plaintiff's "current health care provider (FBOP) has not provided [Plaintiff] with a consistent supply or proper amounts of vitamin D and calcium supplements for his known health condition." *Id.* at 21. As a result, Dr. Marable stated Plaintiff's teeth "were subject to breakdown of the enamel and dentin layers, pulpal exposure and abscesses,

7

as well as decrease[d] bony support from the alveolar bone." *Id*. Dr. Marable further opined that Plaintiff's condition resulted in him "having several teeth loosened from [their] socket," with more teeth being lost as a result of abscesses. *Id*. Dr. Marable stated that these missing teeth should have been replaced, and the failure to replace these teeth caused a condition known as "super eruption," which changed Plaintiff's bite. *Id*. In sum, Dr. Marable noted that Plaintiff "has gone from a situation of barely being able to eat, as a result, [of] malocclusion (due to super eruption), to now being extremely limited to eating foods that must be very soft because he can not mechanically breakdown (chew). This limited ability to eat all types of food further limits [Plaintiff's] ability to receive other nutrients for other vital body organs." *Id*. These injuries, according to Dr. Marable, are due to "the failure of [Plaintiff's] current health care provider (FBOP) to properly treat his health condition, i.e. vitamin D resistant rickets, with proper amounts of vitamin D and calcium." *Id*.

### C. Affidavit of David M. Pon, M.P.M., M.D.

Dr. David M. Pon practiced medicine for approximately twenty-five years in Florida, after receiving a Bachelor's of Science degree in Biological Science from Stanford University; a M.P.M. degree in Public Health from the University of California, Berkeley; and a Medical Degree from the University of California, San Francisco, School of Medicine. *Id*. at 27. After graduating medical school, Dr. Pon completed an internship as a part of a residency program in Internal Medicine at Stanford University, Santa Clara Valley Medical Center. *Id*. Thereafter, Dr. Pon practiced Internal Medicine, General Practice, and Urgent Care Medicine at the Kaiser Permaanente Medicine Center, San Francisco. *Id*. Several years later, Dr. Pon completed a residency program in

8

Opthamology at the University of Chicago, Michael Reese Medical Center, after which he was Board Certified in Opthamology. *Id*.

Dr. Pon reviewed Plaintiff's medical records, medication summary, lab reports, and x-ray reports and opined that "Plaintiff's current medical/health care provider (FBOP) did not provide sufficient treatment for the Plaintiff's health condition." *Id*. at 28. Moreover, Dr. Pon opined that "the dosages that were prescribed by the Plaintiff's current health care provider (FBOP) were far below the minimum dosages required to be effective. . . . [and] the dosages received were so small that no effect would be noted on the Plaintiff's health issue of vitamin D resistant rickets." *Id*. Therefore, according to Dr. Pon, "the treatment was insufficient for the Plaintiff's health condition," and BOP "did not sufficiently or adequately provide the Plaintiff with the proper treatment or amounts of vitamin D, calcium, and phosphate for his health condition of vitamin D resistant rickets." *Id*. at 28–29. Accordingly, Dr. Pon concluded that "the damages and injuries sustained by the Plaintiff, as indicated in the X-ray reports, [are] a direct consequence of such inadequate treatment." *Id*. at 29.

Dr. Pon also submitted a Supplemental Affidavit, which outlines the same two alternative forms of Vitamin D discussed in Dr. Spears' supplemental affidavit. ECF No. 5-1 at 3–4.

## II. Defendant's Motion to Dismiss

Defendant filed a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on the grounds that Plaintiff "failed to state a claim of negligence, failed to exhaust any claim of medical negligence, and failed to file an affidavit of a medical expert as required under South Carolina law." ECF No. 23 at 1. The substance of

9

Defendant's Motion only focuses on two issues: (1) whether Plaintiff properly complied with the expert affidavit requirement of South Carolina Code Section 15-36-100; and (2) whether Plaintiff should be limited to the recovery of the amount initially requested in his administrative claim.[2] *Id*. at 2–4. Plaintiff filed a Response in Opposition, in which he claimed that the increased damages sought were appropriate and legally permissible, his expert affidavits complied with Section 15-36-100, and, in the alternative, his claim should be exempt from Section 15-36-100's affidavit requirement because the negligence in this case was "common knowledge." ECF No. 26. Defendant filed a Reply addressing the "common knowledge" argument, and Plaintiff filed a Sur-Reply further addressing the "common knowledge" argument. ECF Nos. 28, 31.

### III. Magistrate Judge's Report

The Magistrate Judge issued a Report, which largely adopted the Defendant's arguments on the affidavit requirement of Section 15-36-100 and the "common knowledge" exception. ECF No. 33. Specifically, the Report recommends giving Plaintiff thirty days from any Order of the Court adopting the Report to secure an affidavit that complies with the affidavit requirement of Section 15-36-100. *Id*. at 13. Otherwise, the Report recommends that the Court grant Defendant's Motion to Dismiss. *Id.*

### IV. Plaintiff's Objections

Plaintiff filed detailed objections, which address the Report's recommendation. ECF No. 36. Defendant did not file a Reply.

---

[2] Plaintiff sought $14,000,000 in his administrative claim and later sought $15,000,000 in this litigation. ECF No. 23 at 4. As the Magistrate Judge did not address this issue in the Report, the Court need not reach the issue in this Order.

### V. Order Denying Motion to Dismiss

On August 23, 2018, the Court issued an Order respectfully declining to adopt the Report and denying Defendant's Motion to Dismiss. ECF No. 37. The Order comprehensively examined the relevant statutory scheme and common law and determined that Dr. Spears' affidavit was sufficient to satisfy the threshold requirement of Section 15-36-100(A)(3). *Id.* at 17.

Following the Court's Order, Defendant filed a Motion to Reconsider, which is addressed below.

### **LEGAL STANDARD**

"An interlocutory order is subject to reconsideration at any time prior to the entry of a final judgment." *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1469 (4th Cir. 1991); *see* Fed. R. Civ. P. 54(b) ("[A]ny order . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."). While the precise standard governing motions to reconsider an interlocutory order is unclear, the Fourth Circuit has stated that Rule 54(b) motions are "not subject to the strict standards applicable to motions for reconsideration of a final judgment." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514 (4th Cir. 2003). "Compared to motions to reconsider *final* judgments pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, Rule 54(b)'s approach involves broader flexibility to revise *interlocutory* orders before final judgment as the litigation develops and new facts or arguments come to light." *Carlson v. Boston Scientific Corp.*, 856 F.3d 320, 325 (4th Cir. 2017) (citations omitted).

However, "the discretion Rule 54(b) provides is not limitless." *Id*. "For instance, courts have cabined revision pursuant to Rule 54(b) by treating interlocutory rulings as law of the case." *Id*. "Thus, a court may revise an interlocutory order under the same circumstances in which it may depart from law of the case: (1) 'a subsequent trial produc[ing] substantially different evidence'; (2) a change in applicable law; or (3) clear error causing 'manifest injustice.'" *Id*. (quoting *Am. Canoe Ass'n*, 326 F.3d at 515). To win reconsideration on a clear error or manifest injustice theory, the decision cannot be "just maybe or probably wrong"; it must be "dead wrong" and strike the court "with the force of a five-week-old, unrefrigerated dead fish." *TFWS, Inc. v. Franchot*, 572 F.3d 186, 194 (4th Cir. 2009) (quotations and citations omitted). Put simply, motions to reconsider are not "opportunities to rehash issues already ruled upon because a litigant is displeased with the result." *R.E. Goodson Constr. Co., Inc. v. Int'l Paper Co.*, No. 4:02-4184-RBH, 2006 WL 1677136, at *1 (D.S.C. June 14, 2006) (citing *Tran v. Tran*, 166 F. Supp. 2d 793, 798 (S.D.N.Y. 2001)).

## **DISCUSSION**

As set forth in the Order denying Defendant's Motion to Dismiss, ECF No. 7, the central question in this medical malpractice case is whether the three affidavits attached to Plaintiff's Complaint satisfy the expert affidavit requirement of Section 15-36-100 of the South Carolina Code. The Court thoroughly examined the relevant statutory scheme and case law and determined that Dr. Spears' affidavit is sufficient under Section 15-36-100(A)(3) despite Dr. Spears' incarceration and the loss of his license. ECF No. 37 at 17. Defendant's Motion to Reconsider raises several claims of error as to this holding. First, Defendant contends that the Court's holding "is an overbroad interpretation of [Section

12

15-36-100(A)(3)] and constitutes a clear error of law." ECF No. 41 at 3 (internal quotations and citation omitted). Next, Defendant raises a variety of public policy arguments, alleging that the Court's Order "allow[s] manifest injustice and contravenes public policy." ECF No. 41 at 6 (citation omitted). The Court turns first to Defendant's legal argument related to the statutory construction of Section 15-36-100(A)(3).

I. **Section 15-36-100(A)(3)**

Defendant argues that the Order contains an overbroad interpretation of Section 15-36-100(A)(3). Defendant's argument largely restates the arguments it made in its Motion to Dismiss without articulating any specific legal argument as to the plain language of the statute. Instead, Defendant claims that the Court ignored Dr. Spears' criminal history and lack of licensure. Buried beneath the mummeries of Defendant's public policy arguments lies an argument that Dr. Spears "does not verify that his past knowledge of the Plaintiff's condition follows the current standard of care, or that he ever treated any patients with Rickets. ECF No. 41 at 6. Prior to addressing that point, an elementary overview of statutory interpretation principles is warranted.

"'Questions of statutory interpretation are questions of law . . . .'" *Grier v. AMISUB of S.C., Inc.*, 725 S.E.2d 693, 695 (S.C. 2012) (quoting *CFRE, LLC v. Greenville Cnty. Assessor*, 716 S.E.2d 877, 881 (S.C. 2011)). "The cardinal rule of statutory construction is to ascertain and effectuate the intent of the legislature." *Hodges v. Rainey,* 533 S.E.2d 578, 581 (S.C. 2000) (citing *Charleston Cnty. Sch. Dist. v. State Budget and Control Bd*., 437 S.E.2d 6, 8 (1993)). "Under the plain meaning rule, it is not the Court's place to change the meaning of a clear and unambiguous statute." *Id*. (citing *in re Vincent J.*, 509 S.E.2d 261, 262 (1998)). "Where the statute's language is plain and unambiguous, and

conveys a clear and definite meaning, the rules of statutory interpretation are not needed and the court has no right to impose another meaning." *Id*. (citing *Vincent J.*, 509 S.E.2d at 262). "It is only when applying the words literally leads to a result so patently absurd that the General Assembly could not have intended it that we look beyond the statute's plain language." *Grier*, 725 S.E.2d at 695–96 (citing *Cabiness v. Town of James Island*, 712 S.E.2d 416, 425 (2011)).

The Court's Order contains a detailed examination of the language of Section 15-36-100(A)(3), which only requires that the proffered expert "ha[ve] scientific, technical, or other specialized knowledge which may assist the trier of fact in understanding the evidence and determining a fact or issue in the case, by reason of the individual's study, experience, or both." A plain reading of this statute reveals that it is nothing more than a gatekeeping statute, enacted to ensure that meritless claims do not proceed to litigation. In this case, the Court notes that Dr. Spears has a Bachelor's degree in Chemistry, a Medical degree from Emory University, and practiced family medicine for twenty-nine years. ECF No. 1-2 at 1. Dr. Spears has been board certified in Family Medicine and Emergency Medicine for a significant portion of his career, and stated that he is familiar with Vitamin D resistant Rickets. *Id.* Moreover, he opines in his affidavit that BOP's medical care "falls below the standard of medical practices/care for such a medical condition" and offers detailed information about what the appropriate standard of care would be for Plaintiff. *Id.* at 3–6.

While Defendant is correct that Dr. Spears does not state whether he has treated any patients with Rickets, his affidavit thoroughly sets forth his educational background, experience, and knowledge of Rickets and the appropriate standard of care.

14

Furthermore, the affidavit alleges Defendant violated that standard of care. That is all that Section 15-36-100(A) requires. There is no active practice requirement, nor is there any requirement that the expert have treated anyone with the condition in question. In fact, Section 15-36-100(A)(3) allows for qualification of an expert based on his study alone.[3]

Finally, Defendant has changed its own interpretation of Section 15-36-100(A)(3) during this litigation. In its Motion to Dismiss, Defendant stated, "each of [Plaintiff's] alleged experts [are] incarcerated with the BOP and no longer actively licensed in their field, as required by South Carolina law." ECF No. 23 at 13. Now, Defendant acknowledges—as it must under the plain language of the statute—that Section 15-36-100(A)(3) "does not require an expert possess an 'active license.'" ECF No. 41 at 7–8. Throughout the entirety of Defendant's Motion to Reconsider, it does not point to any specific legal error in the Court's interpretation of that statute. Instead, it relies on public policy concerns that are wholly irrelevant to the Court's statutory interpretation and are addressed below.

II. **Public Policy**

Defendant asks this Court to disregard the plain language of Section 15-36-100(A)(3) as a result of several public policy arguments. However, "courts must determine public policy by reference to legislative enactments wherever possible." *Gladden v. Boykin*, 739 S.E.2d 882, 883 (S.C. 2013) (citation omitted). That is so

---

[3] Rickets is not a newly discovered disease spurring Nobel Prize-winning cures. It is a disorder that was described in the medical literature as early as the 17th Century. *See* Kumaravel Rajakumar, MD, *Vitamin D, Cod-Liver Oil, Sunlight, and Rickets: A Historical Perspective*, 112 PEDIATRICS at 132 (2003) (crediting the earliest known description of Rickets to a 26-year-old English medical student in 1645).

because "[t]he primary source of the declaration of the public policy of the state is the General Assembly; [and] the courts assume this prerogative only in the absence of legislative declaration." *Citizens' Bank v. Heyward*, 133 S.E. 709, 713 (1925). Therefore, when the General Assembly has enacted a clear and unambiguous statute that dictates a result in a case, "this court has no power to decide otherwise." *Id.*

That is not to say that Defendant's public policy arguments have no validity. Dr. Spears was convicted of a very serious criminal offense. He may also be violating BOP policies, his prior Judgment & Commitment Order, and perhaps even a criminal statute by offering expert testimony. But none of these provide any basis for disregarding the plain and unambiguous language of Section 15-36-100(A)(3). Indeed, there is nothing in Section 15-36-100(A) that precludes a convicted felon or incarcerated inmate from offering expert testimony in an appropriate case. As Defendant acknowledges, "BOP currently houses nearly 183,000 inmates, including thousands of inmates who were formerly engaged in professional positions such as physicians, pharmacists, dentists, lawyers, judges, and a multitude of other professions." ECF No. 41 at 10. While those inmates may lose certain freedoms and the ability to engage in their professional vocations during, and after, incarceration, they do not leave their knowledge and experience at the prison gate.

Additionally, Defendant's argument that permitting inmates to serve as expert witnesses would be disruptive to prison discipline is well taken by the Court. The Court has not yet qualified Dr. Spears as an expert witness under the applicable evidentiary rules and specifically recognized in its Order that there are "various security and logistical concerns that must be dealt with as they arise" in this case. ECF No. 37 at 25. It may be

the case that BOP regulations and federal law do not permit Dr. Spears to testify at Plaintiff's trial, which is why the Court held that "it may be wise for Plaintiff to obtain an expert opinion from his past or current treating physicians." *Id.* However, under the plain and unambiguous language of Section 15-36-100(A)(3), Dr. Spears' affidavit is sufficient to satisfy the threshold expert affidavit requirement.

The Court further acknowledges that this case presents a close question. As indicated above, Defendant raises a number of very legitimate public policy arguments. "But in the last analysis, these always-fascinating policy discussions are beside the point. The role of this Court is to apply the statute as it is written—even if we think some other approach might accord with good policy." *Burrage v. United States*, 571 U.S. 204, 218 (2014) (internal quotations and citations omitted).

## **CONCLUSION**

Accordingly, Defendant's Motion to Reconsider [41] is **DENIED**. In addition, the Court finds that this action is suitable for early mediation. In light of Plaintiff's pro se status, the Court appoints United States Magistrate Judge Mary Gordon Baker as mediator. Magistrate Judge Baker will be in contact with the parties in short order to schedule a mediation in this case. Accordingly, this matter is recommitted to the Magistrate Judge for further pre-trial proceedings.

IT IS SO ORDERED.

                                                          s/Donald C. Coggins, Jr.
                                                          United States District Judge

February 12, 2019
Spartanburg, South Carolina